**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

MALIBU MEDIA, LLC,

                Plaintiff,

v.

JOHN DOES 1-8,

                Defendants.

**Civil Action No. 1:12-cv-00166-CMH-TRJ**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF JOINDER

**I.**    **INTRODUCTION**

On February 17, 2012, undersigned counsel filed the following nine cases: (1) Malibu Media, LLC. v. John Does 1-23, Civil Action No. 1:12-cv-00159-CMH-TRJ (E.D. Va. 2012); (2) Malibu Media, LLC. v. John Does 1-26, Civil Action No. 1:12-cv-00160-CMH-TRJ (E.D. Va. 2012); (3) Malibu Media, LLC. v. John Does 1-26, Civil Action No. 1:12-cv-00161-CMH-TRJ (E.D. Va. 2012); (4) Malibu Media, LLC. v. John Does 1-16, Civil Action No. 1:12-cv-00162-CMH-TRJ (E.D. Va. 2012); (5) Malibu Media, LLC. v. John Does 1-15, Civil Action No. 1:12-cv-00163-CMH-TRJ (E.D. Va. 2012); (6) Malibu Media, LLC. v. John Does 1-20, Civil Action No. 1:12-cv-00164-CMH-TRJ (E.D. Va. 2012); (7) Malibu Media, LLC. v. John Does 1-27, Civil Action No. 1:12-cv-00165-CMH-TRJ (E.D. Va. 2012); (8) Malibu Media, LLC. v. John Does 1-8, Civil Action No. 1:12-cv-00166-CMH-TRJ (E.D. Va. 2012); (9) Patrick Collins, Inc., v. John Does 1-26, Civil Action No. 1:12-cv-00167-CMH-TRJ (E.D. Va. 2012) (the "Subject Cases"). Each of the Subject Cases has been referred to your Honor and is presently before this Court. As explained in more detail below, each of the Doe Defendants in the Subject Cases has illegally distributed multiple movies, the copyrights to which are owned by one or

1

more studios that undersigned represents.  As discussed below, Plaintiff has expended a significant amount of energy to formulate these cases in such as a way as to promote judicial and litigant economy.

In the Subject Cases, the Plaintiffs collectively allege that a total of one hundred and eighty-seven (187) Doe Defendants infringed their respective copyrights by distributing movies over the internet using the BitTorrent Protocol.  The maximum number of Doe Defendants in one of the Subject Cases is twenty-seven (27) and the minimum number of Doe Defendants in one of the Subject Cases is eight (8).

Significantly, the Subject Cases are very similar to a case formerly before your Honor styled Patrick Collins, Inc. v. Does 1-35, Civil Action No. 1:11-cv-00406-GBL-TRJ (E.D. VA 2011) (the "First Virginia BitTorrent Case").   In the First Virginia BitTorrent Case, your Honor correctly held:

> [w]ithout prejudice to the ability of any defendant or third party to raise the joinder issue later in this litigation, the court finds on the present record that plaintiff has shown proper joinder of these putative defendants prima facie.  That concern having been satisfied, the court follows the weight of authority in finding plaintiff is entitled to discovery at this stage to determine the identities of John Doe Defendants.

Id. at Dkt # 15.

### A.  A Procedural Recitation of Events Surrounding Judge's Gibney's Decision

On August 15, 2011 undersigned filed cases styled (1) Patrick Collins, Inc. v. John Does 1-58, Civil Action No. 3:11-cv-00531-JAG (E.D. Va 2011); (2) K-Beech, Inc. v. John Does 1-85, Civil Action No. 3:11-cv-00469-JAG (E.D. Va 2011); and (3) Raw Films, Ltd. v. John Does 1-32, Civil Action No. 3:11-cv-00532-JAG (E.D. Va. 2011) (the "Second Virginia BitTorrent Cases").  The Honorable Judge Gibney presided over the Second Virginia BitTorrent Cases.  On August 16, 2011 the Court granted Plaintiffs leave to serve the internet service providers with a

subpoena seeking the identities of the Doe Defendants in the Second BitTorrent Cases. The internet service providers complied with the Cable Act, 47 U.S.C. § 551(c)(2)(B), requiring that they notify their subscribers. Upon receiving the ISP's notices, many of the Defendants, encouraged by blogs providing template motions, and relying upon the advice of defense counsel who focus on this type of litigation, filed motions to quash and sever. Scores of similar motions were filed in cases Plaintiffs had pending in New York, New Jersey, Pennsylvania, North Carolina, Maryland, Colorado, Florida, Arizona, California and Virginia.

As part of a coordinated national strategy in the foregoing states, undersigned was instructed by the Plaintiffs in the Second Virginia BitTorrent Cases to voluntarily dismiss those movants seeking to sever the defendants and to re-sue those movants individually. The dismiss-and-re-sue strategy was intended to dissuade BitTorrent defense counsel and pro se Doe Defendants from filing disingenuous motions to sever. Additionally, Plaintiffs intended to reduce their attorneys' fees (it is less expensive to pay a $350 filing fee than it is to pay for an attorney to tailor and properly draft a federal court memorandum in opposition to a motion to sever).

Plaintiff's strategy was working insofar as Plaintiffs had negotiated gentlemen's agreements with several BitTorrent defense counsel who agreed not to advise their clients to file motions to sever into a case formed by Plaintiffs which met the following criteria: (1) there were a comparatively small number of Doe Defendants (viz., less than 100 as opposed to hundreds or thousands, where a court may legitimately have a case management concern); (2) the court had personal jurisdiction over the Doe Defendants; (3) venue was proper in the district, and (4) Plaintiff alleged that all of the Doe Defendants had infringed the exact same copy of the exact same movie as evidenced by a unique cryptographic hash value.

Judge Gibney observed that Plaintiff was voluntarily dismissing the moving Doe Defendants without prejudice. See Patrick Collins, Inc. v. John Does 1-58, Civil Action No. 3:11-cv-00531-JAG, Order at Dkt # 22 (E.D. Va 2011). Unfortunately for Plaintiffs, while several of the complaints and at least one declaration in support of a motion for leave to serve subpoenas had been prepared, at the time of Judge Gibney's ruling, Plaintiff had not yet re-sued one of the dismissed moving Doe Defendants. On October 5, 2011 Judge Gibney *sua sponte* severed the Second Virginia BitTorrent cases. Id. This decision was based on three erroneous assumptions: (1) several of the Doe Defendants claimed "that the plaintiff has contacted them directly with harassing telephone calls, demanding $2,900 in compensation to end the litigation," (2) "[t]he plaintiffs seemingly have no interest in actually litigating the cases, but rather simply have used the Court and its subpoena powers to obtain sufficient information to shake down the John Does"; and (3) "the joinder of unrelated defendants does not seem to be warranted by existing law or a non-frivolous extension of existing law". Id.

The finding regarding harassing phone calls was based on hearsay from another case and Plaintiff. At the time, Plaintiff did not have the identifying information of the Defendants and had no way of contacting them. Additionally, Plaintiff succeeded in proving that it did not have an improper purpose and that there was sufficient law to support its argument that joinder is proper.

Regarding joinder and proper purpose, Judge Gibney ordered Plaintiffs to show cause why they should not be sanctioned under Rule 11. "Pursuant to Rule 11(c)(3), the Court, therefore, will direct the plaintiff and its counsel to show cause why the conduct specifically described in this Memorandum Order has not violated Rule 11(b)." Id. In response to this Order, Plaintiffs filed a combined Emergency Motion for Clarification of and to Amend This Court's Show Cause

4

Order and a Motion for Reconsideration.  Id. at Dkt # 26.  By citing over thirty (30) cases so holding at the time of Judge Gibney's ruling, Plaintiff's Motion for Reconsideration explained that the rule almost universally adopted by Courts, including your Honor, at that time held that joinder was proper in cases where the defendants infringed the exact same copy of the same movie and where jurisdiction and venue was proper over all of the Defendants.  On October 13, 2011, Judge Gibney entered an Amended Order clarifying the original order.  Id. at Dkt # 28.  Following a hearing attended by undersigned on October 24, 2011, Judge Gibney entered an order finding that "there is no sanctionable conduct as to joinder of defendants" but required Plaintiffs to personally attend a hearing on the issue of whether Plaintiffs had an improper purpose within the meaning of Rule 11.  See Id. at Dkt # 37.  That order also required Plaintiffs to obtain new counsel to defend themselves at the proper purpose hearing.  Id. at Dkt # 38.

Plaintiffs chose Wyatt Durrette of DurretteCrump to represent them.  Collectively, Plaintiffs paid DurretteCrump over $110,000 to conclusively establish that they had a proper purpose.  At a fifteen minute hearing held on December 20, 2011, Judge Gibney ruled from the bench that no sanctions would be issued.  Id. at Dkt # 53.  By so doing, he implicitly found that Plaintiffs did have a proper purpose within the meaning of Rule 11.  Subsequently, he issued a one sentence written order stating that "for the reasons stated from the bench, the Court DECLINES to issue sanctions against the plaintiff in this case."  Id. at Dkt. # 54.

**B.  This Court Should Follow Its Prior Decision**

On February 22, 2012, this Court entered an order requesting Plaintiff to file a brief showing why the claims in this matter should not be severed.  Additionally, the Court opined that the issues in this case "may be within the scope of Judge Gibney's October 13, 2011 amended memorandum order in K-Beech, Inc. v. Does 1-85, Civil Action No. 3:11-cv-469 (E.D. Va.)."

5

For the reasons set forth below, your Honor correctly decided the issue of joinder in the case Patrick Collins, Inc. v. Does 1-35, 11-cv-00406-GBL-TRK (E.D. VA 2011), and should now reach the same decision despite Judge Gibney's contrary decision to sever.

1.    **Each of the Defendants in This Suit Are Habitual Infringers**

Plaintiffs have no recourse but to pursue cases for BitTorrent copyright infringement of their movies in Virginia.   Since July 1, 2011, Plaintiffs' investigator, IPP Limited, has determined that in the Eastern District of Virginia, Plaintiff Patrick Collins Inc's movies have been illegally downloaded 6,032 times.   Plaintiff Malibu Media LLC's movies have been illegally downloaded 1,976 times.   If Plaintiffs do not bring these actions against infringers, infringers will believe there is no consequence to stealing Plaintiffs' intellectual property. Plaintiffs will have no way to stop the rampant infringement that takes place on a daily basis.

Plaintiffs have worked extremely hard to formulate suits against Doe Defendants whom, consistent with its analysis of their economic situation, they intend to prosecute.   While joinder is proper because all the Defendants in each suit infringed the exact same copy of the exact same movie, Plaintiffs' investigator will shortly be filing a supplemental declaration attesting that each of the Defendants infringed multiple copyrights owned by one or more movie studios represented by undersigned.   Indeed, each of the 187 defendants before this Court has illegally downloaded at least two of Plaintiffs movies.   In some cases, defendants have illegally downloaded as many as sixteen (16) of Plaintiffs movies.   For cases (1) Malibu Media, LLC. v. John Does 1-23, Civil Action No. 1:12-cv-00159-CMH-TRJ, (E.D. Va. 2012); (2) Malibu Media, LLC. v. John Does 1-26, Civil Action No. 1:12-cv-00160-CMH-TRJ, (E.D. Va. 2012); (3) Malibu Media, LLC. v. John Does 1-26, Civil Action No. 1:12-cv-00161-CMH-TRJ, (E.D. Va. 2012), Defendants have illegally downloaded a file that consisted of every single movie on

Plaintiff's website at the time the illegal file was made.   The exact number of infringements correlated to the studio for each Doe Defendant is attached as Exhibit A.   The Defendants in these cases constitute the most egregious offenders of Plaintiff's copyright in the state of Virginia.

Plaintiff has formulated the subject suits with the intention of ascertaining the Defendants identity through a legally proper method and hopefully reaching an amicable settlement with these individuals.   As explained below in the legal section, severance may be proper later in the case; indeed, Plaintiffs, and other studios who are not yet Plaintiffs, would likely add additional claims against the Defendants who do not settle asserting that the unsettling defendants have infringed additional copyrights not set forth in this initial Complaint.   At that time the commonality of facts, while still remarkably similar, would not be as identical as merely suing the Defendants in any particular suit for infringing the same exact copy of the same exact movie as evidenced by a unique cryptographic hash value.   Instead, there would be various hashes pled against various Defendants, nevertheless retaining the commonality of one hash in one suit.

**2.      If Severed, Plaintiff Would File 10 Individual Suits A Week for Eighteen Weeks Against the Doe Defendants In The Subject Suits**

Plaintiffs have authorized undersigned to inform the Court that if the Subject Cases are severed they intend to file ten individual suits a week for eighteen weeks until they have sued each of the individuals identified in the Subject Suits.   For obvious reasons, such a process would not be the most economical use of either the litigant's or this U.S. Court system's resources. Indeed, if forced to pursue this route, Plaintiffs would have to prepare 187 individual suits, 187 motions for leave to conduct discovery, 187 declarations in support thereof, etc.   Further, this Court would have to issue orders in all those cases and otherwise manage a process that is much more easily managed if the Doe Defendants remained joined in the cases as formulated.   While

the individual suit process is labor intensive, Plaintiffs have done it before in Pennsylvania after which the Honorable Judge Schiller declined to sever further cases.  See Patrick Collins, Inc., v. John Does 1-21, 2:11-cv-05173-BMS, Order at Dkt. # 17 (E.D. Pa 2011).    Plaintiffs are committed to doing it again because they simply cannot afford to allow citizens of any state to believe that they can steal their property with impunity.  Severance is not necessary, however, because the law overwhelmingly supports joinder at this stage of the proceeding.  Indeed, the vast majority of judges and courts around the country hold that joinder is proper.  Further, Plaintiff respectfully suggests that those very, very few judges which have severed have failed to fully appreciate that "[w]hen one acts on pity against justice, it is the good whom one punishes for the sake of the evil; when one saves the guilty from suffering, it is the innocent whom one forces to suffer."  Aᴙɴ Rᴀɴᴅ, Aᴛʟᴀs Sʜʀᴜɢɢᴇᴅ 565 (Plume Reprint ed., 1999) (1957).[1]

## II.   FACTS

### A.   On-Line Piracy Affects Everyone

According to Torrent Portal, a leading torrent index website, it is tracking 2,776,262 torrents (almost all of them copyrighted works), and 2,242,565,420 peers (almost all of them stealing copyrighted works).   See http://www.torrentportal.com/.  Any person that goes to torrentportal.com can search for any movie, song or book and discover that almost anything can be downloaded for free.  By way of example only, there are 5,612 illegal copies of Harry Potter movies; 2,006 illegal copies of Beatles songs or albums;  3,151 illegal copies of Microsoft

---

[1] The tiny minority of infringers who use BitTorrent (estimated to be less than 5 million in the U.S.) account for well over 20 percent of the bandwidth used on the internet.  See Envisional Technical Report: An Estimate of Infringing Use on the Internet, http://documents.envisional.com/docs/Envisional-Internet_Usage-Jan2011.pdf .  The price of internet service is based upon the scarcity of bandwidth.  The BitTorrent infringers in this case, and others like them, cost all internet using Americans money every month by significantly driving up the cost of our internet.  See On Blind Mice and the Elephant: Understanding the Network Impact of a Large Distributed System, http://www.aqualab.cs.northwestern.edu/publications/JOtto11SIGCOMM.pdf.  Despite the Doe Defendants' protestations to the contrary it is equitable and just to find BitTorrent infringers liable for stealing Plaintiffs' copyrighted works.

8

software or manuals;  11,211 illegal copies of computer games;  and 13,315 illegal copies of books, – all available to be downloaded for free.  Even high school and college text books are now being put on BitTorrent.[2]  The problem for the publishing industry is expected to rapidly increase as the global population moves quickly toward using e-readers like the Kindle and I-Pad instead of tangible books.

The scale of infringement is staggering:

Pre-release copies of Wolverine were downloaded 100,000 times in 24 hours after a leak in April 2009. In 2008, seven million copies of Batman: Dark Knight were downloaded on BitTorrent.[3]

A ten percent reduction in software piracy would yield $400 billion in economic growth:

If the global software piracy rate was lowered just 10 percentage points over the next 4 years, this would contribute a total of 2.4 million new jobs and $400 billion in economic growth to the global economy.[4]

In short, on-line piracy affects every thought and entertainment producer in the country, including: the authors of articles, books, software and computer games; producers and authors of movies; writers and singers of songs; schools and professors; individuals, big and little companies.  It also affects the companies that make ancillary products such as DVDs, the graphic designers that make the covers, the laborers that make cellophane wrap that covers DVDs, the retail workers at Walmart and other stores that sell them, and the truck drivers who drive them to the retail outlets.  The problem for copyright owners is dire:

We are in danger of creating a world where nothing appears to have any value at all,  and  the  things  that  we  make...will  become  scarce  or  disappearing

[2] "For years digital piracy has been a problem most associated with music. Today, however, creative industries including movie, publishing and television, regard 'monetising' the online world and addressing digital piracy as their greatest challenges. 'The music industry was hit first, but now with increased broadband you have a situation where all the creative industries are at a tipping point.'  * * * 'You can see it in the collapsing DVD market; you can see what's going on in TV, newspapers and magazines. And now we're seeing the same thing in the book publishing business and you're going to start seeing piracy of novels and reference books.'"  <u>"Music, how, when and where you want it,"</u> International Federation for Phonographic Industry (IFPI), at p. 20 (attached).
[3] <u>Id.</u>
[4] http://www.microsoft.com/piracy/knowthefacts/HowPiracyImpactsYou.aspx

commodities.  Stephen Garrett, Chief Executive, Kudos (a popular UK television and film production company.)[5]

Mainstream media producers and adult entertainment producers are suing for BitTorrent copyright infringement.  Given the enormous magnitude of the problem, Courts should establish precedents that make it easier – not harder – for all copyright owners to combat on-line infringement.

### B.   Competing In a Rigged Market Place – The Lure of Free

The International Federation for Phonographic Industry (IFPI), issued a thought provoking report last year entitled "Music, how, when and where you want it," attached as Exhibit B.  On page 18, the IFPI provides statistics establishing that file sharers' primary motivation for their theft is the "lure of free:"

> A separate body of research helps explain why illegal file-sharing is having this impact on consumer behavior, confirming the main driver of piracy to be not better choice or quality, but the "lure of free". Researchers GFK found that "because it's free" was the main answer given among over 400 illegal filesharers in research unveiled in Sweden in July 2009. A study by Entertainment Media Research in the UK found that 71 per cent of those who admitted they increased their file-sharing activity in 2008 did so "because it's free". In Norway, research by Norstat in 2009 also found the most cited reason for illegal downloading from P2P services was "because it's free". Further studies came to broadly the same conclusion in Japan and Belgium in 2009.

(Emphasis added.)

Lawyers and judges write for a living.  Therefore, we understand that creating intellectual products costs money.  Imagine if our clients could hack into our systems and download and use our tailored work products without paying for them.  No one will work for free, and authors and producers across all industries simply cannot and will not ever be able to compete with free:

---

[5] "Music, how, when and where you want it," International Federation for Phonographic Industry (IFPI), at p. 20 (attached).

It is the "free-to-user" appeal of illegal file-sharing that creates its unfair advantage over legitimate music services, whose cost base, including payments to artists and copyright holders, cannot compete with the free illegal alternative.[6]

Copyright owners, including Plaintiff, are <u>desperately</u> searching for a cost effective solution to combat the destruction of their businesses. Toward that end, they have been and will continue to exercise their First Amendment right to petition the courts and lawmakers. The response to copyright owners' efforts has been enormously positive from all branches of government, including the overwhelming majority of courts across the country supporting copyright owners' attempts to combat the problem of BitTorrent infringement.

## C. The Executive Branch and Congress Are All Very Concerned With The Jobs And Money Lost From Online Piracy

On June 22, 2010, Vice President Biden, speaking for the Executive Branch, said of on-line piracy "[t]his is theft, clear and simple."[7]  "It's smash and grab, no different than a guy walking down Fifth Avenue and smashing the window at Tiffany's and reaching in and grabbing what's in the window." <u>Id.</u>  "[O]n February 16, 2011, the Senate Judiciary Committee, led by Chairman Patrick Leahy (D-Vt.), held a hearing . . . about the growing problem of online infringement. . . ."[8]  Leahy said "[t]he problem of online infringement is real; it is substantial; and it is a drain on our economy, which costs American jobs." <u>Id.</u>  He continued "[c]opyright piracy and the sale of counterfeit goods are reported to cost the American economy billions of dollars annually and hundreds of thousands of lost jobs." <u>Id.</u>

While the problem has grown <u>exponentially</u> over the last five years, in 2007 the Institute for Policy Innovation found "[u]sing a well-established U.S. government model and the latest copyright piracy figures . . .  copyright piracy from motion pictures, sound recordings, business

---

[6] <u>Id.</u>
[7] <u>See</u>  http://www.reuters.com/article/2010/06/22/us-usa-trade-web-idUSTRE65L3YN20100622
[8] <u>See</u> http://www.techzone360.com/news/2011/02/16/5318701.htm.

and entertainment software and video games costs the U.S. economy $58.0 billion in total output,
costs American workers 373,375 jobs and $16.3 billion in earnings, and costs federal, state, and
local governments $2.6 billion in tax revenue."[9]

### D.  Congress Specifically Amended the Copyright Act to Deter Infringement

Legislative history demonstrates that Congress specifically amended the Copyright Act to
deter copyright infringement in the digital age, recognizing the likelihood of widespread
infringement through the internet:

> By the turn of the century the Internet is projected to have more than 200
> million users, and the development of new technology will create additional
> incentive for copyright thieves to steal protected works. The advent of digital
> video discs, for example, will enable individuals to store far more material than
> on conventional discs and, at the same time, produce perfect secondhand
> copies. . . . Many computer users are either ignorant that copyright laws apply
> to Internet activity, or they simply believe that they will not be caught or
> prosecuted for their conduct. Also, many infringers do not consider the current
> copyright infringement penalties a real threat and continue infringing, even
> after a copyright owner puts them on notice that their actions constitute
> infringement and that they should stop the activity or face legal action. In light
> of this disturbing trend, it is manifest that Congress respond appropriately with
> updated penalties to dissuade such conduct. H.R. 1761 increases copyright
> penalties to have a significant deterrent effect on copyright infringement.

H.R. Rep. No. 106-216, at 3 (1999).

### E.  Core Copyright Businesses Comprise a Huge Part of The U.S.'s Economy

According to the International Intellectual Property Alliance's 2011 report prepared in
connection with the U.S. government, attached as Exhibit C, the copyright industry has a total
value added to the U.S. economy of 1.6 trillion dollars.  The copyright industry employs nearly
10 million people, and these people have an average salary of $78,000 compared to the $61,000
for the rest of the country.  As these statistics demonstrate, businesses that depend on copyrights
for their survival comprise a huge component of the United States' economy.

---

[9] A copy of the report is attached as Exhibit C.

**F. Piracy of Adult Content Impedes Parents' Ability to Prohibit Children from Watching It**

As Congress and parents know – the power of the purse is a tremendous tool for controlling behavior. The ability to download adult content for free is enabling minors to watch movies that are not age appropriate – all while secreting this behavior from parents. Significantly, minors would need a credit card or PayPal account to buy adult content on-line. Many parents would surely notice these charges if they showed up on billing statements. Since piracy makes these movies available for free, parents are denied their right to use the power of the purse to control their children's behavior.

**G. Professional Digital Pirates Situate Themselves Overseas; And, Thumb Their Noses at Copyright Owners**

Plaintiff sues the only people it can – end users – because professional digit pirates intentionally situate themselves overseas to avoid prosecution. To explain, there are three types of entities which can be sued for BitTorrent infringement: (a) BitTorrent Clients (the software companies), (b) torrent websites, and (c) end users. As to BitTorrent Clients, context is needed to understand the difficulties. Specifically, to avoid a claim for contributory infringement, in 2001, contemporaneously with Napster's demise, Grokster, a company that studied the A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (2001) decision, introduced software and a system intentionally designed so that Grokster could not tell what was being shared among and between its users. Grokster promoted itself as Napster's replacement; its efforts led to MGM Studios, Inc. v. Grokster, Ltd. 545 U.S. 913 (2005) wherein the United States Supreme Court unanimously held that Grokster could be sued for "inducing" copyright infringement for marketing file sharing software. Since BitTorrent has legitimate non-infringing uses, unless a particular BitTorrent Client expressly advertises itself as a means to accomplish copyright infringement,

13

like Grokster, then a case against said BitTorrent Client would be tough.  Moreover, there are countless BitTorrent Clients, they are available for download for free, and many of these companies are located outside the reach of U.S. courts on purpose.

A suit against the digital thieves running torrent websites, where infringers go to download and distribute songs and movies, would and has been successful.[10]  Unfortunately, litigating against torrent sites now is virtually impossible because torrent sites intentionally situate themselves overseas in jurisdictions that do not enforce U.S. copyright laws.  For example, one of the most popular torrent sites, obnoxiously thumbs its nose at U.S. copyright owners by posting its responses to demand letters on its website.  See its response to Dreamworks, Inc.'s demand letter stating: "Sweden is a country in northern Europe . . . no Swedish law is being violated . . . you are morons, and you should please go sodomize yourself with retractable batons."[11]  The self proclaimed "Biggest Torrent System", Extratorrent.com, which illegally distributes Plaintiff's movies, not only hides itself in Somalia but is changing the top level of its domain from .com to .ws in anticipation of a U.S. Bill entitled Combating Online Infringement and Counterfeits Act ("COICA") becoming law.[12]  The Pirate Bay, a notorious torrent site hosted in Sweden, made a statement on their blog about international efforts to block their website:

> Today we learned that we're being blocked - again! Yawn. When will they give up - we're still growing despite (or perhaps because) all their efforts. So, if you live in Belgium (or maybe work at the European Union Parliament, we have thousands of visits from them every day) you should change your DNS in order to circumvent the blockage. You should do this anyhow - never trust your ISP.

---

[10] See Columbia Pictures Ind., Inc. v. Bunnel, 2:06-cv-01093-FMC-JCx (C.D. Cal. 2006) (Awarding 111,000 to Plaintiffs against the then popular Torrentspy website.)
[11] See http://static.thepiratebay.org/dreamworks_response.txt
[12] See http://extratorrent.com/ the red lettering on the home page which states please pay attention "[w]e are in the process of migrating the site to our new domain extratorrent.ws."

TPB Censored, Again and Again and Again (Oct. 4, 2011) available at http://thepiratebay.org/blog.

Faced with a very serious problem of infringement and no easy solution for solving it, Plaintiff made the difficult choice to enter into a complicated, extraordinarily labor intensive and expensive copyright enforcement campaign against individual file sharers.

## H. Absent Joinder, Data Retention Issues Will Cause Plaintiff To Sue John Does That Cannot Be Identified

Plaintiff has learned through suits across the country that there are major deficiencies associated with many internet service providers' ability to correlate a subscriber to an individual.[13]   Many ISPs delete the data correlating an individual to an IP address after only a few weeks.   According to the FBI, 19% of its ISP lookup requests in one child pornography investigation failed to yield a positive identity.  See FN 2.  Plaintiff's statistics are similar, 10-15% of the identities subpoenaed by Plaintiff in cases nationally fail to identify a person or legal entity.  While most national ISPs are fairly good at retaining data, several other national ISPs and many regional ISPs are very bad at it.  Any decision regarding joinder in a BitTorrent peer-to-peer copyright case simply must take data retention and data failure issues into consideration. Significantly, a rule requiring Plaintiff to sue John Doe defendants on an individual basis creates the substantial risk that the target will not be identified.   Unless the Court system allows Plaintiff to join cases, Plaintiff runs the risk of being unable to identify a significant number of defendants.

---

[13] See Statement Of Jason Weinstein Deputy Assistant Attorney General Criminal Division Before The Committee On Judiciary Subcommittee On Crime, Terrorism, And Homeland Security United States House Of Representatives, (January 2011) at http://judiciary.house.gov/hearings/pdf/Weinstein 01252011.pdf

I.   **Joinder is Required By Rule 1's Instruction to Judges to Construe The Rules to Secure the Inexpensive Determination of Every Action**

Fed.R.Civ.P. 1 requires that Courts construe the rules to secure the inexpensive determination of every action.  Fed.R.Civ.P. 20, the joinder rule, has the same purpose.  As explained below, disallowing joinder is inconsistent with the purpose of both Rules.  Indeed, since jurisdiction and venue is proper in this District, if Plaintiff was forced to proceed individually all of these cases would be filed in this District.  Plaintiff would have to file notices of related cases.  Presumably, this Court would consolidate the cases for purposes of judicial management.  Thereafter, at every stage of the process, the litigants and the Court would be faced with additional work.  For example, instead of one motion for leave to serve subpoenas in advance of a 26(f) conference, there would be many such identical motions.  Instead of one Rule 26(f) conference and report, there would be many such identical Rule 26(f) conferences and reports.  Identical pleadings and papers would be repetitively filed.  Not only would this needlessly increase the costs for the parties and Court but also for the third party internet service providers.

III.  **LEGAL ARGUMENT**

Fed. R. Civ. P. 20(a)(2) states:

Persons . . . may be joined in one action as defendants if:
  (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
  (B) any question of law or fact common to all defendants will arise in the action.
"Under the Federal Rules generally, 'the impulse is toward the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).  "Absolute identity of all events is unnecessary.  Further, the rule should be construed in light of its purpose,

16

which 'is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits.'" <u>Saval v. BL Ltd.</u>, 710 F.2d 1027, 1031 (4th Cir. 1983) (internal citations omitted).  Here, severing Defendants will create multiple totally unnecessary lawsuits.

### A.  <u>The Logical Relationship Test</u>

Courts across the country employ the "logical relationship" test to ascertain whether joinder is proper under the same transaction or series of transactions test.  According to the rule, a series of transactions may be a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship, and absolute identity of all events is unnecessary.  "'Transaction' is a word of flexible meaning. <u>It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship.</u>"  <u>Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 371(1926)</u> (underlining added).  The Fourth Circuit has liberally construed the logical relationship test to promote judicial economy.  <u>See Sue & Sam Mfg. Co. v. B-L-S Const. Co.</u>, 538 F.2d 1048 (4th Cir. 1976).  "We are also reminded that the rule should be given a broad realistic interpretation to avoid a multiplicity of suits."  <u>Id</u>. at 1051.  The logical relationship test has been consistently used in decisions concerning BitTorrent copyright infringement in suits across the country.  <u>See e.g. Patrick Collins, Inc. v. John Does 1-2590,</u> 2011WL 4407172, * 6 (N.D. Cal. 2011).

### B.  <u>The Way BitTorrent Works, Infringers Continue To Distribute Files Indefinitely</u>

The BitTorrent protocol is a distribution system.  All the Defendants were distributing the movie to the other peers in the swarm.  <u>See</u> Plaintiff's Dec. ¶¶20-21.  BitTorrent continues to distribute data for a particular torrent file until the user commands its BitTorrent Client (software program) to stop distributing it.  Many users never instruct the program to stop distributing data.  According to BitTorrent's own website:

**Seeding** is where you leave your BitTorrent client open after you've finished your download to help distribute it (you distribute the file *while* downloading, but it's even more helpful if you continue to distribute the full file even after you have finished downloading). Chances are that most of the data you got was from seeds, so help give back to the community! It doesn't require much - BitTorrent will continue seeding until the torrent is removed. [Underlining added.]

See http://www.bittorrent.com/help/guides/beginners-guide.

## C.  Same Swarm BitTorrent Infringement is Logically Related

The following description of BitTorrent can be found at http://computer.howstuffworks.com/bittorrent2.htm, and describes the series of transactions:

BitTorrent is unique insofar as it distributes the burden of sharing files to all users:



### WHAT BITTORENT DOES

Unlike some other peer-to-peer downloading methods, BitTorrent is a protocol that offloads some of the file tracking work to a central server (called a tracker).   Another difference is that it uses a principal called tit-for-tat.  This means that in order to receive files, you have to give them.  This solves the problem of leeching – one of the developer Bram Cohen's primary goals.  With BitTorrent the more files you share with others, the faster your downloads are.  from multiple computers.



What makes the BitTorrent protocol unique is that it distributes [the burden of] the sharing of files to **all** users who have downloaded or are *in the process* of downloading a file. Because BitTorrent breaks up and distributes files in hundreds of small chunks, you don't even need to have downloaded the whole file before you start sharing. As soon as you have even a piece of the file, you can start sharing that piece with other users. That's what makes BitTorrent so fast; your BitTorrent client starts sharing as soon as it downloads one chunk of the file (instead of waiting until the entire download has been completed).  [Parenthetical added, emphasis added.]

See://lifehacker.com/285489/a-beginners-guide-to-bittorrent.  By causing all users to distribute the file, BitTorrent ensures that all peers in a swarm materially aid every other peer.   This critical fact makes BitTorrent different than every other peer-to-peer network and is one of the reasons BitTorrent cases are distinguishable from previous peer-to-peer copyright cases.

### D. Doe Defendants Distributed The Same Exact Torrent File As Evidenced By A Cryptographic Alphanumeric Hash Value

As alleged in the Complaint, Plaintiff's movie was processed by a BitTorrent Client (a BitTorrent software program) which generated a torrent file.  The BitTorrent Client divided the movie into hundreds or thousands of digital parts called "pieces."[14]  "Each piece is protected by a cryptographic hash contained in the torrent descriptor."  Id.  The Hash system was created by the National Security Agency.[15]  It is used not only by BitTorrent but by this Court when it sends CM/ECF filing receipts to litigants (the alphanumeric code at the end of the filing receipt is a cryptographic hash.)   "Cryptographic hash functions have many information security applications, notably in digital signatures, message authentication codes (MACs), and other forms of authentication."  See FN 15.  In BitTorrent, "[w]hen another peer later receives a particular piece, the hash of the piece is compared to the recorded hash to test that the piece is error-free."  See FN 14.  "Cryptographic hash values are sometimes called (digital) fingerprints." See FN 15.

Plaintiff's investigators use the hash value as a digital fingerprint that enables Plaintiff to ensure that all of the infringements alleged in this suit arise from the exact same unique version of Plaintiff's movie as evidenced by the cryptographic hash value.  Significantly, many of Plaintiff's movies have been initially seeded several times.  Each seeding produces its own independent swarm.  Here, Plaintiff has only sued Defendants in the exact same swarm.

---

[14] See http://en.wikipedia.org/wiki/BitTorrent_(protocol)
[15] See http://en.wikipedia.org/wiki/Cryptographic_hash

**E. The District of Columbia Correctly Supports Joinder In BitTorrent Cases**

The District of Columbia has issued by far and away the longest, most comprehensive, decisions concerning the issues, including joinder, raised in BitTorrent litigation. Eight cases D.C. judges have adjudicated, which can be found on Westlaw, are as follows: (1) <u>Voltage Pictures, LLC v. Vazquez,</u> 2011 WL 5006942 (D.D.C. 2011) (opining joinder is proper and that Doe Defendants do not have standing to intervene in the discovery process prior to being named as a defendant); (2) <u>NuImage, Inc. v. Does 1-22,322</u>, 2011 WL 3240562 (D.D.C. 2011) (10 page opinion, permitting joinder but raising concerns about long-arm); <u>West Coast Productions, Inc. v. Does 1-5829</u>, 275 F.R.D. 9 (D.D.C. 2011) (11 page opinion, permitting joinder, holding long arm could be used, denying all motions to quash); <u>Call of the Wild v. Does 1-331</u>, 274 F.R.D. 334 (D.D.C. 2011) (permitting joinder, holding long arm could be used, denying all motions to quash); <u>Maverick Entertainment Group, Inc. v. Does 1-2115</u>, 2011 WL 1807428 (D.D.C. 2011) (18 page opinion, permitting joinder, holding long arm could be used, denying all motions to quash); <u>Voltage Pictures, LLC v. Does 1-5000</u>, 79 Fed.R.Serv.3d 891 (D.D.C. 2011) (18 page opinion permitting joinder, holding long arm could be used, denying all motions to quash); <u>Donkeyball Movie, LLC v. Does 1-171</u>, 2011 WL 1807452 (D.D.C. 2011) (15 page opinion permitting joinder, holding long arm could be used, denying all motions to quash); <u>Call of the Wild v. Does 1-1062,</u> 770 F.Supp.2d 332 (D.D.C. 2011) (36 page opinion addressing all of the issues raised in pre-Doe identification BitTorrent litigation.) Significantly, the <u>Call of the Wild</u> Court denied all of the motions to quash, ruled in favor of copyright owners on the joinder issue, the free speech issue, the right to remain anonymous issue [Doe's who file motions do not have that right], allowed Plaintiff to use the long arm statute, and held that internet service providers cannot refuse to comply with subpoenas on the basis that it is unduly burdensome.

### F. Joinder is Proper Because the Defendants' Infringement Was Part of a Series of Transactions

In construing the Federal Rules of Civil Procedure, "[w]here the defendants' acts are part of a series of acts or transactions, it is not necessary that each defendant be charged in each count, nor to show that each defendant participated in every act or transaction in the series." United States v. Santoni, 585 F.2d 667, 673 (4th Cir. 1978). "Although 'series of acts or transactions' is not defined in the Rule, such phrase logically includes those transactions so interconnected in time, place and manner as to constitute a common scheme or plan. Id.

### 1. Here, Plaintiff Properly Pled a Series of Transactions

Pursuant to Fed. R. Civ. P. 8, under the notice pleading standard, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007). Additionally, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the Complaint." Id. at 94. Plaintiff's Complaint easily satisfies Rule 8's requirement to give Defendants notice that Plaintiff is asserting that Defendants acted together in the same transaction or through a series of transactions. See Compl. ¶29, ¶30, ¶31, ¶33, ¶38, ¶39.

When deciding on this exact issue, the Middle District of Florida held:

> Each seeding produces its own independent swarm. Plaintiff limited the Defendants in this suit to those allegedly using the exact same swarm. Based on these allegations, the Plaintiff's claims against the Defendants are logically related. Each John Doe Defendant is a possible source for the Plaintiff's work, and may be responsible for distributing the movie to other John Doe Defendants, who are also using the same file-sharing protocol to copy the identical copyrighted material.

<u>K-Beech Inc., v. John Does 1-57</u>, Case 2:11-cv-00358-CEH-SPC,   at*12 (M.D. Fl. 2011).

While the logical relationship test does not require it, should this matter go to trial, Plaintiff will prove that the Defendants' infringement was committed through the same transaction or through a series of transactions with mathematical certainty by demonstrating, *inter alia,* that the algorithm used by BitTorrent Trackers would have caused the entire series of transactions to be different <u>but</u> <u>for</u> each of the Defendants' infringements.

## 2. <u>There Are Common Issues of Fact and Law</u>

"Rule 20(a)(2)(B) requires the plaintiffs' claims against the putative defendants to contain a common question of law or fact." <u>Call of the Wild</u>, 770 F.Supp.2d at 343. "The plaintiffs meet this requirement." <u>Id.</u> "In each case, the plaintiff will have to establish against each putative defendant the same legal claims concerning the validity of the copyrights in the movies at issue and the infringement of the exclusive rights reserved to the plaintiffs as copyright holders." <u>Id.</u> The "factual issues related to how BitTorrent works and the methods used by plaintiffs to investigate, uncover and collect evidence about the infringing activity will be essentially identical for each putative defendant." <u>Id.</u>

## G. **Joinder Promotes Judicial Efficiency and is Beneficial to Putative Defendant and Doe Defendants Cannot Demonstrate Prejudice At This Stage**

"The Court finds no prejudice to the Defendants at this stage in the litigation. In fact, the Court finds that joinder in a single case of the Defendants who allegedly infringed the same copyrighted material both promotes judicial efficiency and benefits the Defendants, who will be able to see the defenses, if any, raised by other John Does." <u>K-Beech Inc., v. John Does 1-57</u>, Case 2:11-cv-00358-CEH-SPC,  at*12 (M.D. Fl. 2011).

"[T]he putative defendants are currently identified only by their IP addresses and are not named parties. Consequently, they are not required to respond to the plaintiffs' allegations or assert a defense. The defendants may be able to demonstrate prejudice [after being named], but they cannot. . . before that time." Call of the Wild v. Does 1-1062, 770 F.Supp.2d 332, 344 (D.D.C. 2011).

### H. Disallowing Joinder Would Effectively Prevent Plaintiff From Being Able to Enforce Its Copyrights and Would Be Inconsistent With Rule 1

The Call of the Wild Court held that disallowing joinder would effectively prevent Plaintiff from being able to enforce its copyrights:

> The plaintiffs would be forced to file 5,583 separate lawsuits * * * Plaintiffs would additionally be forced to pay the Court separate filing fees in each of these cases, * * * This would certainly not be in the "interests of convenience and judicial economy," or "secure a just, speedy, and inexpensive determination of the action." Given the administrative burden of simply obtaining sufficient identifying information to properly name and serve alleged infringers, it is highly unlikely that the plaintiffs could protect their copyrights in a cost-effective manner.

Id. at 344-345.

### I. District Courts From Around the Country Permit Joinder

#### 1. Courts in the Fourth Circuit Permit Joinder

The District Court of Maryland has issued at least four opinions stating that joinder is proper in similar BitTorrent actions. See Patrick Collins Inc. v. Does 1-22, 2011 WL 5439005 (D. Md. 2011) (holding joinder is proper and may actually be beneficial to the defendants); Patrick Collins Inc. v. Does 1-11, 2011 WL 5439045 (D. Md. 2011) (holding joinder is proper and may actually be beneficial to the defendants); K-Beech Inc. v. John Does 1-22, 2011 WL 60000768 (D. Md. 2011); (holding joinder is proper and may actually be beneficial to the defendants); Third Degree Films v. Does 1-118, 2011 WL 6837774 (D. Md. 2011) (holding joinder is proper and may actually be beneficial to the defendants). Additionally, the Western

District of North Carolina has held joinder is proper.  See Patrick Collins Inc. v. John Does 1-26,

3:11cv394 (W.N.C. 2011) (denying motions to sever).

### 2.   The District Court of Colorado Permits Joinder

In every BitTorrent copyright infringement case before the court, the District Court of

Colorado has ruled that joinder is proper and creates judicial efficiency.  See Patrick Collins, Inc.

v. John Does 1-33, 2012 WL 415424 (D. Colo. 2012).

> [R]ather than result in needless delay, joinder of the Doe Defendants 'facilitates
> jurisdictional discovery and expedites the process of obtaining identifying
> information, which is prerequisite to reaching the merits of [Plaintiff's] claims .'
> *Voltage Pictures,* 2011 WL 1807438, at *7. Therefore, the Court concludes that
> joinder under Rule 20(a)(2) is proper at this juncture.

Id. at 3.

### 3.   California District Courts Permit Joinder

All three Districts in California which have adjudicated joinder in BitTorrent copyright

infringement cases hold that joinder is proper.   In Camelot Distribution Group v. Does 1-1210,

2011 WL 4455249, *3 (E.D.Cal. 2011), the Court "conclude[d] that a decision regarding joinder

would be more appropriately made after further development of the record."  See also, Berlin

Media Art E.K. v. Does 1-144, 2011 WL 4056167 (E.D. CA. 2011) (permitting discovery in

joined case.)  In Liberty Media Holdings, LLC v. Does 1-62, 2011 WL 1869923 (S.D.Cal.2011)

the Court held "[a]fter careful consideration of the issue, . . . [i]n this case, the complaint

sufficiently *alleges* that defendants are properly joined due to the use of BitTorrent, which

necessarily requires each user to be an uploader as well as a downloader."

Chief Magistrate Judge Maria Elena-James sums up the decisions of the judges in the

Northern District of California who have repeatedly held that joinder is proper.   See e.g. Patrick

Collins v. Does 1-2590, 2011 WL 4407172 (N.D. Cal. 2011), noting that "[r]ecently, courts in

this District . . . have come to varying decisions about the proprietary of joining multiple defendants in BitTorrent infringement cases" and finding:

> This Court has carefully reviewed such decisions and notes that they are highly dependent on the information the plaintiff presented regarding the nature of the BitTorrent file-sharing protocol and the specificity of the allegations regarding the Doe defendants' alleged infringement of the protected work. Both of these factors guide the Court's joinder analysis . . . [in concluding joinder is proper].
> <u>See also</u>, <u>New Sensations, Inc. v. Does 1-1,474</u>, 2011 WL 4407222, (N.D.Cal. 2011)

(same.) <u>Accord</u> <u>Hard Drive Productions, Inc. v. Does 1–46</u>, 2011 U.S. Dist. LEXIS 67314 (N.D. Cal. 2011) (same); <u>New Sensations, Inc. v. Does 1745</u>, 2011 WL 2837610 (N.D. Cal. 2011) (same, and opining "Judge Howell of the D.C. Circuit has repeatedly held that in infringement actions" joinder is proper "[h]is analysis makes sense.")[16]

### 4.  <u>The Northern District of Illinois Permits Joinder</u>

There are only four decisions which come up using Westlaw and the terms "BitTorrent & joinder" in Illinois; they are <u>Hard Drive v. Does 1-55</u>, 2011 WL 4889094, (N.D.Ill 2011); <u>First Time Videos, LLC v. Does 1-76</u>  --- F.R.D. ----, 2011 WL 3586245 (N.D.Ill.,2011); <u>First Time Videos, LLC v. Does 1-500</u>, --- F.Supp.2d ----, 2011 WL 3498227 (N.D.Ill.,2011); <u>MGCIP v. Does 1-316,</u> 2011 WL 2292958 (N.D. Ill. 2011).   All four Illinois decisions held joinder is proper and distinguish previous Illinois decisions (which cannot be found on Westlaw) that do not so hold.

### 5.  <u>New York Permits Joinder</u>

Courts in New York have held that joinder is proper in BitTorrent copyright cases when as here all Doe Defendants' IP addresses were traced to this district and all of the Defendants in a

---

[16] <u>See</u> <u>Pacific Century Intern v. Does 1-48,</u> 2011 WL 4725243 (N.D. Cal. 2011) (a poorly reasoned opinion holding that if Plaintiff admits additional discovery is needed to proceed against the correct person then joinder is improper.) <u>Cf Liberty Media Holdings, LLC v. Swarm of November 16, 2010,</u> 2011 WL 1597495 (S. D. Cal. 2011) (holding a claim for negligently letting others to use your internet could withstand a motion to dismiss).  Here, Plaintiff intends to pursue each Doe Defendant.

given case participated in the same swarm of infringers as evidenced by a cryptographic hash value.  See DigiProtect USA Corp. v. Does, 2011 WL 4444666 (S.D.N.Y. 2011).  See also Digital Sin, Inc. v. Does 1-176, 12-CV-00126 AJN, 2012 WL 263491 (S.D.N.Y. Jan. 30, 2012).

Although not on Westlaw, in a complaint with very nearly verbatim identical allegations as the one before the Court now, New York held joinder was proper.  Patrick Collins v. John Does 1-9, 11-cv-01269 (S.D.N.Y. 2011) (Dkt. 10) stating: "Order denying Motion to Quash and to Sever.  Upon careful consideration, for the reasons stated in plaintiff's opposition, the motion is denied."

### 6.  New Jersey and Florida Permit Joinder

Courts in New Jersey and Florida have also permitted joinder in BitTorrent actions where, as here, all of the defendants were a part of the same swarm.  See K-Beech v. John Does 1-39, et. al., 11-cv-04776 (D. NJ Jan.6, 2012); K-Beech Inc., v. John Does 1-57, Case 2:11-cv-00358-CEH-SPC, at*12 (M.D. Fl. 2011); AF Holdings, LLC v. Does 1-162, Case No. 11-23036, (S.D. Fl Feb. 14, 2012).

### J.  Joinder is Also Proper Because Plaintiff Pled That Each of the Defendants Is Contributorily Liable For Each Other Defendant's Infringement

Joinder is also proper because Plaintiff pled that each Defendant is contributorily liable for each of the other Defendant's infringement.  "It is, today, a given that 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory infringer.'"  Costar Group, Inc. v. Loopnet, Inc., 164 F. Supp.2d 688, 696 (M.D. 2001).  Here, Plaintiff properly pled contributory infringement.  See Compl. ¶¶ 54-59.

Significantly, Plaintiff will prove that there was one initial seeder that uploaded the subject torrent file identified by the unique hash value.  Plaintiff will further prove that when a

Defendant receives a piece from a downstream infringer, i.e., an infringer who already had that piece, then that Defendant will automatically begin distributing the piece it received from the downstream infringer to others.  By doing so, Plaintiff will prove that said Defendant materially assists the downstream infringer's direct infringement of Plaintiff's exclusive right to "redistribute . . . the Work. . . ."  in violation of 17 U.S.C. § 106(3) and 17 U.S.C. §501. Similarly, when a Defendant provides a piece of Plaintiff's copyrighted work to an upstream infringer, Plaintiff will prove that the upstream infringer both sends that piece to other infringers and will also assemble the entire Work.  Accordingly, by delivering a piece to an upstream infringer, the Defendant is contributorily liable for materially assisting the upstream infringer to redistribute, perform and display the Work in violation of 17 U.S.C. § 106(3)-(5) and 17 U.S.C. § 501.

### 1.  <u>Contributory Infringement is a Jury Question</u>

Since one of the grounds for permissive joinder is joint and several liability, should the Court hold that joinder is not <u>permitted</u>, then any such holding would effectively summarily adjudicate Plaintiff's claim for contributory infringement.  Such a holding would be erroneous because contributory infringement is "a question of fact for trial."  <u>Adobe Systems, Inc. v. Canus Productions, Inc.</u>, 173 F. Supp.2d 1044, 1055 (C.D. Cal. 2001); <u>Marobie-FL, Inc. v. National Ass'n of Fire Equipment Distributors</u>, 983 F. Supp. 1167 (N.D. IL 1997) ("fact questions precluded summary judgment with respect to providers' liability for contributory infringement"). Moreover, since BitTorrent works through the cooperative exchange among peers in a swarm, claims for contributory infringement must be permitted or the law would be inconsistent with the very nature of BitTorrent.

**2.   Plaintiff Intends to Call Several of the Defendants To Prove Contributory Infringement vis-à-vis the other Defendants**

Regarding contributory infringement, by way of example, Plaintiff has to prove Doe 1 is liable for direct infringement in order for Plaintiff to succeed on its claim that Doe 2 is contributorily liable for Doe 1's infringement.   Indeed, "without proof of direct infringement there can be no liability for contributory infringement."   Bridgeport Music, inc. v. Diamond Time, Ltd., 371 F.3d 883 (6th Cir. 2004).   Accordingly, to support its claim of contributory infringement against each Defendant vis-a-vis each other Defendant, Plaintiff intends to call each of the Defendants to prove the direct infringement.   The realities associated with Plaintiff's evidentiary burdens weighs in favor of having one trial, as opposed to multiple trials, so that the parties' resources are not squandered.

**K.   The Cases Relied Upon By Judge Gibney Have Been Distinguished In Such A Way As Would Make Joinder Proper Here**

The Honorable Judge Gibney, in his October 13, 2011 order, relies on case law that is distinguishable from the current case.   Judge Gibney references LaFace Records v. Does 1-38, 2008 WL 544992 (E.D.N.C. 2008) which involved an entirely different set of circumstances.   In LaFace, eleven recording studios sued over dozens of copyrights.   The only commonality supporting joinder was that the Defendants used Gnutella, a peer-to-peer file sharing protocol. Significantly, Gnutella works through one peer to one peer transactions; i.e., a user connects to one computer and gets the whole file.   Here, Plaintiff only sued on one copy of one movie which was broken up into pieces by BitTorrent.   And, Plaintiff alleged that the Defendants were distributing the pieces to each other.   Indeed, BitTorrent works differently than Gnutella insofar as it causes all participants in a swarm to upload pieces of the movie to each other. Consequently, here, Plaintiff pled that each of the Defendants is contributorily liable for the

infringement of each of the other Defendants.  This is yet another basis to hold that joinder is proper.

Judge Gibney also relied upon the holding in <u>Hard Drive Productions, Inc. v. Does 1-188</u>, 809 F.Supp.2d 1150 (N.D. Cal. 2011), which would require all the defendants to have been present in the swarm on the same day and at the same time.  This is inconsistent with the Fourth Circuit test which defines transaction as "a word of flexible meaning which may comprehend a series of many occurrences depending not so much on the immediateness of their connection as upon their logical relationship." <u>Sue & Sam Mfg. Co. v. B-L-S Const. Co.</u>, 538 F.2d 1048, 1051 (4th Cir. 1976) (citing <u>Moore v. New York Cotton Exch.</u>, 270 U.S. 593 (1926)).

Indeed, the Northern District of California has since ruled joinder is proper in BitTorrent actions in several different cases.  <u>See</u>  <u>First Time Videos, LLC v. Does 1-95</u>, 2011 WL 4724882 (N.D. Cal. Oct. 7, 2011).  <u>See</u> <u>also</u> <u>Pac. Century Int'l, Ltd. v. Does 1-48</u>, 2011 WL 4725243 (N.D. Cal. 2011).  In <u>Pac. Century</u> the court notes that each Defendant continues to impact the swarm even after their file is downloaded.  "[E]ven after a Doe Defendant disconnects from the swarm, the parts of the file that he downloaded and uploaded will continue to be transferred to other Doe Defendants remaining in the swarm." <u>Id</u>. at 6.  These cases are in line with this Court's precedent concerning joinder.

III.      **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the subject motion.

Dated:  March 2, 2012

Respectfully submitted,

O'BRYAN LAW FIRM

By:      /s/ *D. Wayne O'Bryan*

D. Wayne O'Bryan, Esq.
Virginia Bar number 05766
Attorney for Plaintiff
O'Bryan Law Firm
1804 Staples Mill Road
Richmond VA 23230
Phone: 804-643-4343
Fax:    804-353-1839
dwayneobryan@gmail.com